Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:11-cv-00804-EAK-EAJ

ALLSTATE INSURANCE COMPANY;
ALLSTATE INDEMNITY COMPANY;
ALLSTATE PROPERTY AND CASUALTY
 INSURANCE COMPANY;
ALLSTATE FIRE AND CASUALTY
 INSURANCE COMPANY; and
ALLSTATE VEHICLE AND PROPERTY
 INSURANCE COMPANY (F/K/A: DEERBROOK
 INSURANCE COMPANY, SUCCESSOR BY
 MERGER TO NORTHBROOK INDEMNITY
 COMPANY),

          Plaintiffs,

vs.

SARA C. VIZCAY, M.D,;
BEST CARE MEDICAL CENTER, INC.;
CALEB HEALTH CARE, INC.;
FLORIDA REHABILITATION PRACTICE, INC.;
 (F/K/A: DANA MEDICAL CENTER, INC.);
GLOBAL DIAGNOSTIC CENTER, INC.;
PERSONAL MEDICAL CENTER, INC.;
P.V.C. MEDICAL CENTER, INC.; and
REGIONAL ENTERPRISES FOR HEALTH
 CORPORATION,

          Defendants.
*   *   *   *   *   *   *   *   *   *   *   *   *   *

                    VOLUME I (Pages 1 - 106)

VIDEOTAPED
DEPOSITION OF:      EUSEBIO MANUEL AQUINO

DATE TAKEN:         September 24, 2012

TIME:               9:25 a.m.

PLACE:              Masten, Lyerly, Peterson & Denbo
                    6730 West Linebaugh Avenue
                    2nd Floor Conference Room
                    Tampa, Florida

REPORTED BY:        Terri Dukes, RPR and

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 2

```
1    APPEARANCES:
2    TAMMY B. DENBO, ESQUIRE
        Masten, Lyerly, Peterson & Denbo
3       6730 West Linebaugh Avenue
        Suite 101
4       Tampa, Florida 33625
5          Appearing on behalf of the Plaintiffs
6          - and -
7    INGUNA VARSLAVANE-CALLAHAN, ESQUIRE
        Callahan & Martinez
8       2935 1st Avenue North, Floor 2
        St. Petersburg, Florida 33713
9
           Appearing on behalf of the Plaintiffs
10             via telephone
11   KIMBERLY P. SIMOES, ESQUIRE
        The Simoes Law Group
12      120 South Woodland Boulevard
        Suite 213
13      Deland, Florida 32720
14         Appearing on behalf of the Defendants
               via telephone
15
     Also Present:
16
        Jesse Leonor, Spanish Interpreter
17      Lorraine Leary, Allstate Representative
        Marilyn McCloskey, Video Camera Operator
18
19
20
21
22
23
24
25
```

Page 3

```
1    TESTIMONY OF EUSEBIO MANUEL AQUINO
2       Direct Examination by Ms. Denbo        5
3    Certificate of Oath                     105
4    Certificate of Reporter                 106
5         - - - - -
6            E X H I B I T S
7                           PAGE
8    Exhibit A
        Amended Notice and Subpoena for deposition    12
9
     Exhibit B
10      Copy of Florida driver's license        12
11   Exhibit C
        Copy of Caleb Health Care, Inc., business
12      card                                  82
13   Exhibit D
        Composite of property transaction records
14      from Clerk of the Circuit Court Hillsborough
        County records                        96
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1         THE VIDEO OPERATOR:  We are now on the record
2    in the matter of Allstate Company versus Vizcay,
3    M.D.  Today's date is September 24th, 2012.  The
4    time is approximately 9:25 a.m.  This is the
5    videotaped deposition of Eustudo --
6         MS. LEARY:  Eusebio Aquino.
7         THE VIDEO OPERATOR:  -- Eustudo --
8         MS. LEARY:  Eusebio Aquino.
9         THE VIDEO OPERATOR:  -- Eusebio Aquino being
10   taken at 6730 West Linebaugh Ave., Tampa, Florida.
11   My name is Marilyn McCloskey.  I am the camera
12   operator representing First Choice Reporting
13   located at 211 South Orange Avenue, Orlando,
14   Florida.  The court reporter is Terri Dukes with
15   First Choice.  Will counsels please introduce
16   themselves for the record.
17        MS. DENBO:  Tammy Denbo, counsel for
18   Allstate.
19        MS. SIMOES:  Kim Simoes, counsel for the
20   defendants.
21        THE VIDEO OPERATOR:  Would the court reporter
22   please swear in the interpreter who will then
23   swear in the witness.
24        MS. DENBO:  We also have Inguna Callahan on
25   the phone representing Allstate.
```

Page 5

```
1         MS. CALLAHAN:  Thank you for saying it,
2    Tammy.
3         MS. DENBO:  You're welcome.
4         - - - - -
5            JESSE LEONOR,
6    having been first duly sworn to interpret from English
7    to Spanish and Spanish to English all testimony to the
8    best of his ability.
9         THE INTERPRETER:  So help me God I do.  And
10   my name is Jesse Leonor, L-e-o-n-o-r.
11        - - - - -
12        EUSEBIO MANUEL AQUINO,
13   having been first duly sworn, was examined and
14   testified upon his oath, through the interpreter, as
15   follows:
16        THE WITNESS:  Yes.
17           DIRECT EXAMINATION
18   BY MS. DENBO:
19     Q   Good morning.  My name is Tammy Denbo.  I'm
20   an attorney that represents Allstate in this matter.
21   And you're here for your deposition today.  Do you
22   understand that you have been placed under oath and the
23   significance of being placed under oath?
24     A   Yes.
25     Q   Prior to today's deposition it was our
```

2 (Pages 2 to 5)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 6

1    understanding that you were represented by Attorney
2    Jorge Chalela. We have spoken to his office this
3    morning, and he advised us that he was only
4    representing you with regard to a court hearing, and he
5    is not representing you with regard to your deposition
6    today. He also advised that he is in trial, so he is
7    not available for the deposition today.
8         I had a conversation with you prior to going
9    on the record and advised you of this. I also advised
10   you that you do have the right to obtain an attorney
11   should you like to have an attorney here for your
12   deposition today. And I gave you the option of either
13   not going forward today so that you could obtain an
14   attorney or going forward today if you chose to not
15   have an attorney. And after that conversation, you
16   advised that you prefer to go ahead and do the
17   deposition today without an attorney. And I just need
18   to get that agreement on the record, please.
19        A   Yes.
20        Q   If at any point in time you feel like you
21   need to stop the deposition because you want to have an
22   attorney, you do have that right. So please make sure
23   you let us know, and we will do that at that time. Do
24   you understand?
25        A   Yes.

Page 7

1         Q   During the deposition today, the court
2    reporter is going to be typing down everything that we
3    all say. She can only type down one person talking at
4    a time. So it's important that you allow me to finish
5    my question before you answer. And it's also important
6    that you allow the interpreter to finish interpreting
7    before you answer. Since she's typing down what we're
8    saying, it's important that you answer out loud using
9    words. Because if you shake or nod your head or say
10   "Uh-huh" or "Huh-uh," it's hard for her to type that
11   down. Do you understand all of that?
12        A   Yes.
13        Q   Can you state your full name?
14        A   Eusebio Aquino.
15        Q   And can you spell that, please?
16        A   E-u-s-e-b-i-o A-q-u-i-n-o.
17        Q   Do you have a middle name?
18        A   Manuel.
19        Q   Is that M-a-n-u-e-l?
20        A   Correct.
21        Q   Have you ever been known by any other name?
22        A   No.
23        Q   Do you spell your name any different way?
24        A   No.
25        Q   Are you married or single?

Page 8

1         A   Single.
2         Q   Have you ever been married?
3         A   Not in this country.
4         Q   Who were you married to?
5         A   Excuse me?
6         Q   Have you been married outside of this
7    country?
8         A   In another -- yes, in another country.
9         Q   Who were you married to?
10        A   I don't think that's related to this case
11   here.
12        Q   Background information can be related to the
13   case. I'm going to ask you if you'd be willing to
14   provide that information, or are you refusing to
15   provide the information?
16        A   I consider that as nothing to do with what
17   you are --
18        Q   Okay. So that you understand, if there's a
19   question that you do not want to answer, we may have to
20   take that to the court later on and ask the court if
21   you're required to answer that question. So part of
22   that process is if there's something you're not going
23   to answer, each time I'm going to ask you if you're
24   refusing to answer the question. And then you will
25   need to answer yes or no. Okay?

Page 9

1         A   Okay.
2         Q   Are you refusing to answer the question with
3    regard to the name of your former spouse?
4         A   I'm not refusing. I'm giving an answer, and
5    I'm saying that it's nothing to do with that.
6         Q   I'm asking you the name of your former
7    spouse. Are you refusing to give me your former
8    spouse's name?
9         A   At this time, I really don't remember,
10   because it was many years ago.
11        Q   You don't remember your former spouse's name?
12        A   No.
13        Q   How many times have you been married?
14        A   One time.
15        Q   What's your date of birth?
16        A   February 16th, 1970.
17        Q   I'm going to ask you to provide your social
18   security number, but only the last four digits while
19   we're on the record to protect your privacy. Then we
20   will go off the record for you to say the full social,
21   and then we will go back on. Okay? So at this time if
22   you can just tell me the last four digits of your
23   social.
24        A   2693.
25            MS. DENBO: We'll go off the record.

3 (Pages 6 to 9)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 10

1    THE VIDEO OPERATOR: Off the record 9:32 a.m.
2    (Discussion off the record.)
3    MS. DENBO: Back on the record.
4    THE VIDEO OPERATOR: On the record 9:32 a.m.
5 BY MS. DENBO:
6    Q   What is your phone number?
7    A   I also don't think that's something I have to
8 give you. That's something private of mine.
9    Q   Now that you're not represented by an
10 attorney, if we need to get in touch with you to either
11 review the transcript from today or to come back, we
12 need a way to get in touch with you.
13    A   You have the address there on the license
14 where you can send any letter, any subpoena, or
15 whatever.
16    Q   Okay. So you're not willing to provide a
17 phone number for yourself?
18    A   I believe it's enough with what I just told
19 you where there's an address to send that. It's the
20 same address for which I'm here.
21    Q   Where were you born?
22    A   In Cuba.
23    Q   Have you taken any medication in the past 24
24 hours?
25    A   No.

Page 11

1    Q   Do you have any problems with your memory?
2    A   No.
3    Q   Have you ever been convicted of a crime
4 involving dishonesty or a false statement?
5    A   No.
6    Q   Have you ever been convicted of a felony?
7    A   No.
8    Q   Have you ever had to give a deposition like
9 this before?
10    A   No.
11    Q   Have you ever been a party to a lawsuit,
12 meaning has a court case ever been brought against you
13 or have you had to bring a case against someone else?
14    A   No.
15    Q   Was there a 2009 case in Hillsborough County
16 where you and Bryan Toledo were both sued by a Laura
17 and Richard G-u-l-l-e-d-g-e?
18    A   I had nothing to do with that. That was -- I
19 think that had something to do with some accident,
20 something that happened regarding two automobiles. But
21 I didn't go to any court. I didn't have to go to
22 anything or any of that.
23    Q   Did you review anything to prepare for your
24 deposition today?
25    A   How is that? I don't understand the

Page 12

1 question.
2    Q   Were there any documents that you looked at
3 or went over in order to prepare for your statement
4 that you're giving here today?
5    A   No.
6    Q   Did you speak with anyone to prepare for the
7 statement today?
8    A   No.
9    MS. DENBO: I'm going to attach a copy of
10 your deposition notice as Exhibit A. I'm also
11 going to attach a copy of the driver's license
12 that you have provided as Exhibit B.
13    (Exhibit A and Exhibit B were marked for
14 identification.)
15 BY MS. DENBO:
16    Q   And you advised you're still living at the
17 address on your driver's license. Is that correct?
18    A   Correct.
19    MS. DENBO: So for the record, that is 6941
20 Silver, S-i-l-v-e-r, separate word Sage, S-a-g-e,
21 Circle, Tampa, Florida 33634.
22 BY MS. DENBO:
23    Q   How long have you lived there?
24    A   Around three years, more or less.
25    Q   Do you own your home there?

Page 13

1    A   No.
2    Q   Who owns it?
3    A   I also do not think that he should come out
4 to play in this.
5    Q   Are you refusing to tell me who owns your
6 residence?
7    A   No. I'm not refusing. But I don't have
8 the -- I have the right to say -- to not say who he is
9 or give any information.
10    Q   But you're not going to tell me at this time
11 who the owner is. Correct?
12    A   I can't tell you, because it doesn't concern
13 me. And like I said, I don't have a right to talk
14 about him.
15    Q   Okay. So that you know, every time you don't
16 answer something, I have to ask you that. Are you
17 going to answer the question or not? Okay? And it
18 speeds it up if you understand that that's something
19 that I have to do. So you are not going to provide me
20 the information regarding the person who owns your
21 home. Correct?
22    A   Correct.
23    Q   Do you have any plans to move at this time?
24    A   Right now, no.
25    Q   Where did you live before you lived at Silver

4 (Pages 10 to 13)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 14

1   Sage Circle?
2       A   Close to there.
3       Q   The same neighborhood?
4       A   No.
5       Q   When did you come to the United States?
6       A   I came on the 11th of October of '98.
7       Q   What is the highest level of education you
8   have completed?
9       A   Well, I did a technical career in my country.
10      Q   And what type of technical career?  What
11  area?
12      A   In thermo energy.
13      Q   Have you pursued any type of education in the
14  United States?
15      A   No.
16      Q   Do you have any medical training or any
17  medical licensure or degrees?
18      A   No.
19      Q   Have you ever worked at any other medical
20  clinics besides Caleb Health Care?
21      A   No.
22      Q   Did you used to work at Caleb Health Care?
23      A   Could you repeat that again?
24      Q   Sure.  Did you used to work at Caleb Health
25  Care?

Page 15

1       A   In other words, I worked at Caleb Health
2   Care?
3       Q   Right.
4       A   Uh-huh.
5       Q   Yes?
6       A   (Nodding head.)
7       Q   Just remember you have to answer out loud.
8       A   Yes.
9       Q   So you worked at Caleb Health Care, but you
10  have never worked at any other medical clinic?
11      A   Correct.
12      Q   Do you have any family that works in any
13  medical clinics?
14      A   No.
15      Q   Where are you currently employed?
16      A   Right now I'm not employed.
17      Q   How long has it been since you have been
18  employed?
19      A   Well, employed per se, I finished around June
20  of 2011 --
21      Q   Where were you working --
22      A   -- around there.
23      Q   Where were you working up until June of 2011?
24      A   At Caleb Health Care.
25      Q   Are you affiliated with any other businesses?

Page 16

1       A   No.
2       Q   Do you have a trucking business?
3       A   I work with a truck.
4       Q   You didn't own it?
5       A   In other words, how do I explain it?  I had
6   my own truck.
7       Q   And would you drive the truck?
8       A   Yes.
9       Q   What did you transport?
10      A   Merchandise, clothes.
11      Q   Who did you work for?
12      A   I worked in many -- in several companies.
13      Q   Do you still do that?
14      A   Right now, no.
15      Q   When is the last time you did that?
16      A   Well, I -- I left the truck job around in
17  2007, thereabouts.
18      Q   Just prior to working at Caleb Health Care
19  where did you work?
20      A   I don't remember the name of the company.
21      Q   What type of company was it?
22      A   It was a merchandise transportation company.
23      Q   Prior to working at Caleb Health Care had you
24  ever worked in any type of a medical clinic before?
25      A   No.

Page 17

1       Q   At Caleb Health Care what was your title?
2       A   It was as a manager.
3       Q   When did you start working there?
4       A   Well, I started around -- around April of
5   2008.
6       Q   Did you continuously work there until June of
7   2011?
8       A   Yes.
9       Q   Was that a full-time job?
10      A   Yes.  As a full-time, exactly.
11      Q   Were you an employee or an independent
12  contractor?
13      A   An employee.
14      Q   Who was your boss?
15      A   Dr. Sara Vizcay.  Yes.
16      Q   Who determined how you would be compensated
17  and how much?
18      A   Who?  To me?
19      Q   Yes.  Who determined how much you would get
20  paid and how often you would get paid?
21      A   She would.
22      Q   Dr. Vizcay?
23      A   Uh-huh.
24      Q   You have to answer out loud.
25      A   Yes, she.

First Choice Reporting & Video Services
Worldwide Scheduling

www.firstchoicereporting.com                                          800.939.0093

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 18

1    Q   Was your compensation hourly or salary or
2    some other type of compensation?
3        A   It was a fixed salary.
4    Q   Did you ever receive any bonuses?
5        A   No.
6    Q   Were you ever given a portion of the profits
7    of the clinic?
8        A   No.
9    Q   Where did you work in 2006 and 2007?
10       A   Driving trucks.
11   Q   Is that the only thing?
12       A   Yes.
13   Q   Have you filed personal tax returns from 2007
14   going forward each year?
15       A   Could you explain that question to me again?
16   Q   Sure. Have you filed a tax return each year
17   starting from 2007 up until now?
18       A   Correct.
19   Q   Have you ever owned a management company?
20       A   No.
21   Q   Have you ever worked at a management company?
22       A   No.
23   Q   Other than serving as the manager for Caleb
24   Health Care, have you ever worked anywhere else where
25   you managed a health care clinic or you managed medical

Page 19

1    billing?
2        A   No.
3    Q   Have you ever been listed as an officer or a
4    director of a corporation on the corporate paperwork
5    that gets filed with the State of Florida?
6        A   Could you explain that to me again?
7    Q   Sure. Businesses have paperwork that get
8    filed with the State of Florida. And on them it will
9    list names of officers, like a board of directors. It
10   will list those names. Have you ever been listed on a
11   corporation?
12       A   In a medical corporation are you asking me?
13   Q   Any corporation.
14       A   Well, I had another corporation. It was a
15   business that I tried to move forward, but it didn't
16   turn out.
17   Q   What type of business was that?
18       A   It was a -- like a supply business for
19   offices -- for offices.
20   Q   Did you ever handle medical supplies?
21       A   In other words, are you asking me about
22   within the clinic?
23   Q   No. This company that you had that you said
24   that you handled supplies, did that company handle any
25   type of medical supplies?

Page 20

1        A   No.
2    Q   What was the name of that company?
3        A   Look, I don't think that -- I think you're
4    getting out of the subject. And you're asking
5    questions that are very, very personal. And there's no
6    reason to continue to talk about that.
7    Q   So you're not going to answer that question?
8        A   No.
9    Q   Have you ever owned another company besides
10   that office supply company?
11       A   No.
12   Q   Have you ever been in the business of selling
13   homes -- houses?
14       A   Selling houses?
15   Q   Yes.
16       A   Well, yes. I was -- I believe I was in 2006
17   or something like that.
18   Q   Was there a company that you worked for?
19       A   We are also not going to talk about that.
20   Q   So you're not going to answer that question?
21       A   No.
22   Q   Did you ever own any other homes within the
23   Waters Edge community which is where you're living now?
24       A   How is that question?
25   Q   The community where you live now, that's

Page 21

1    called Waters Edge. Correct?
2        A   Well, I think it's called like that. I'm
3    not -- I think so.
4    Q   It's like a circle, the neighborhood?
5        A   Uh-huh. Yes.
6    Q   Have you ever owned any of those other homes
7    in that circle of your neighborhood?
8        A   No.
9    Q   Have you ever sold homes to anyone else that
10   works in a medical clinic?
11       A   How's that?
12   Q   Have you ever sold a home to anyone else that
13   works in a medical clinic?
14       A   No.
15   Q   Is the business Aquino Home Investment, Inc.,
16   your business?
17       A   Yes.
18   Q   Do you still have that business?
19       A   No.
20   Q   When did you stop owning that business?
21       A   I don't remember.
22   Q   Did you change that business name to Aquino
23   Transport?
24       A   No. I don't remember what -- it was many
25   years ago. No.

6  (Pages 18 to 21)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)                  5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 22

1    Q   Have you ever been involved in transporting
2  patients?
3    A   How's that? Can you explain that again?
4    Q   Sure. In any of the places you have worked,
5  have you ever been involved with driving patients to
6  different places?
7    A   I really don't understand what she's asking
8  me.
9    Q   I will explain. You have been saying that
10 you have been involved with transportation. And I know
11 part of that transportation you said that you would
12 transport merchandise, like clothing. Sometimes when
13 people are involved in transportation, they drive
14 people. Did you ever drive people anywhere?
15   A   No. It was merchandise what I would do,
16 not -- I was not a driver of any omni -- how do you
17 call them -- a bus of any type.
18   Q   Did you ever drive any patients who went in
19 for appointments with doctors? Did you ever drive them
20 anywhere?
21   A   No.
22   Q   Are you associated with MTR Injury Center,
23 Inc.?
24   A   What is she saying?
25   Q   Have you ever worked at or been associated

Page 23

1  with the business called MTR Injury Center, Inc.?
2    A   That doesn't relate to the case either.
3  You're getting out -- it seems to me you're getting
4  out.
5    Q   So you're not going to answer that question?
6    A   No.
7    Q   Office World Solutions, Inc. Was that your
8  office supply company?
9    A   Correct.
10   Q   Have you ever -- have you ever worked at
11 Regional Enterprises for Health?
12   A   No.
13   Q   Have you ever worked at Global Diagnostic
14 Center?
15   A   No.
16   Q   Have you ever worked at Best Care Medical
17 Center?
18   A   No.
19   Q   Have you ever worked at PVC Medical Center?
20   A   No.
21   Q   Have you ever worked at Personal Medical
22 Center?
23   A   No.
24   Q   Is Caleb Health Care still open and seeing
25 patients?

Page 24

1    A   I think not.
2    Q   When did it stop doing business?
3    A   In other words, me or the business?
4    Q   When you stopped working there, did the
5  business close or did it stay open?
6    A   Well, I left, because the doctor said there
7  were no longer going to be any operations.
8    Q   And that was June of 2011?
9    A   Exactly.
10   Q   And that was Dr. Vizcay that said the clinic
11 was going to close?
12   A   Well, she didn't really tell me that it was
13 going to close. She told me that the operations were
14 going to stop. That she would not need me anymore for
15 the time being.
16   Q   And that's Dr. Vizcay you're talking about?
17   A   Yes.
18   Q   Do you know why she no longer needed your
19 services at the clinic?
20   A   I don't know.
21       MS. SIMOES: I'm going to object, because
22 you're asking him to speculate. He can answer the
23 question.
24 BY MS. DENBO:
25   Q   Do you know what happened to the furniture

Page 25

1  inside the clinic?
2    A   I don't know.
3    Q   Or the equipment and supplies?
4    A   I don't know.
5    Q   Do you know what happened to the remaining
6  assets of the clinic?
7    A   I don't know.
8    Q   When you first came to work at Caleb were you
9  a manager when you first came in?
10   A   Yes.
11   Q   What days and hours did you work?
12   A   Well, from Monday through Friday. And if it
13 was necessary, I'd come on some Saturday or weekends to
14 work as well.
15   Q   What were your typical hours on Monday
16 through Friday?
17   A   Well, from 9:00 in the morning until around
18 6:00 or 7:00 in the afternoon.
19   Q   Were there any other managers at the same
20 time that you were a manager?
21   A   No.
22   Q   When you came to Caleb was that business
23 already open and running, or did you start working
24 there right when the business started?
25   A   No. That was already working there.

www.firstchoicereporting.com

First Choice Reporting & Video Services
Worldwide Scheduling

800.939.0093

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Eusebio Manuel Aquino - 9/24/2012

Page 26

1    THE VIDEO OPERATOR: Can we take a quick
2  break?
3    MS. DENBO: Yes. Off the record for the
4  videographer.
5    THE VIDEO OPERATOR: Off the record at
6  9:58 a.m.
7    (Off the record.)
8    THE VIDEO OPERATOR: Back on the record at
9  10 a.m.
10 BY MS. DENBO:
11   Q  When you started working at Caleb was there a
12 manager that was already there before you?
13   A  I don't know.
14   Q  Were you given a key to the clinic?
15   A  Yes.
16   Q  Who else had keys to Caleb while you were
17 working there?
18   A  The doctor.
19   Q  Dr. Vizcay?
20   A  Yes.
21   Q  Did anyone else have a key?
22   A  From there, no. Well, perhaps the folks who
23 clean. Uh-huh.
24   Q  How do you know that Dr. Vizcay had a key?
25   A  I imagine she had a key, because she was the

Page 27

1  one who gave me a copy.
2    Q  Do you know if she had a key?
3    A  I don't know.
4    Q  How did you come into contact with Dr. Vizcay
5  or Caleb so that you started working there?
6    A  Because I knew her.
7    Q  How did you know Dr. Vizcay?
8    A  I think that that neither -- it's not
9  important enough to speak about that.
10   Q  So are you not going to answer the question
11 as to how you knew Dr. Vizcay?
12   A  No.
13   Q  Is there anyone else that assisted you with
14 getting a job at Caleb Health Care besides Dr. Vizcay?
15   A  No.
16   Q  Did you ever work at another clinic with
17 Dr. Vizcay?
18   A  No.
19   Q  How long have you known Dr. Vizcay?
20   A  Dr. Vizcay -- a lot of time.
21   Q  How long?
22   A  Since I arrived to this country.
23   Q  Right when you arrived you met her?
24   A  Exactly.
25   Q  But you're not going to tell me how you met

Page 28

1  her?
2    A  No.
3    Q  Did you contact Dr. Vizcay about working at
4  Caleb, or did she contact you?
5    A  No. I called her.
6    Q  Why did you decide you wanted to start
7  working at a clinic?
8    A  Well, because it's a lighter job, and I think
9  that it was better for me.
10   Q  Did you have any experience working in a
11 clinic?
12   A  No.
13   Q  How did you feel that you would have the
14 right training to serve as manager of the clinic?
15   A  Well, I don't think that -- here everything
16 that has to be done can be learned. Even the President
17 himself, he doesn't know how to be President when he
18 sits in the President's chair.
19   Q  Was there someone that trained you to be the
20 manager of Caleb?
21   A  Yes.
22   Q  Who trained you?
23   A  Dr. Sara Vizcay.
24   Q  When did she train you?
25   A  When I started to work there.

Page 29

1    Q  So you were getting trained while you were
2  already working there?
3    A  Exactly.
4    Q  How many days a week did she train you?
5    A  Well, basically around three -- three or four
6  days according to how often she could go by there. And
7  then I would call her regarding any questions or any
8  concern I had related to the work. And she would call
9  me to mention things that I had to do as well when she
10 was not present.
11   Q  So the training that you did with Dr. Vizcay,
12 describe the training that you received.
13   A  Well, the training was how to handle the
14 administrative part of the clinic.
15   Q  And that was only Dr. Vizcay that did all
16 that training?
17   A  Yes.
18   Q  No one else offered you any training?
19   A  No.
20   Q  Did you ever train with anyone else that
21 worked at a different clinic?
22   A  No.
23   Q  Did you have a written employment agreement
24 with the clinic?
25   A  Yes.

8  (Pages 26 to 29)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 30

1   Q   Do you still have that?
2   A   I'm not the one who has to have that.
3   Q   But do you have a copy of it?
4   A   I don't think so. I don't have it.
5   Q   Did you ever have any ownership interest in
6   Caleb Health Care?
7   A   No.
8   Q   And you said before you never received any
9   profits from Caleb Health Care. Correct?
10  A   No.
11  Q   Who is the owner of Caleb Health Care?
12  A   Dr. Sara Vizcay.
13  Q   How do you know that she was the owner?
14  A   Well, because she told me and --
15  Q   Is there anyone else that you know that has
16  any portion of an ownership interest in Caleb Health
17  Care?
18  A   No.
19  Q   Did you contribute any money toward Caleb?
20  A   How's that question?
21  Q   Did you give any money to the business to
22  help the business succeed?
23  A   No.
24  Q   Did you contribute any money toward any of
25  the supplies or furniture in the clinic?

Page 31

1   A   No.
2   Q   Did you ever purchase any portion of the
3   clinic?
4   A   No.
5   Q   Did you ever take out any loans for the
6   clinic?
7   A   No.
8   Q   Did you ever pay for any renovations to the
9   clinic?
10  A   Well, I didn't pay any of that.
11  Q   Was any stock in the clinic ever issued to
12  you?
13  A   Explain that again. What do you mean by
14  "stock"?
15  Q   There's certificates that are issued if
16  somebody owns any portion of a clinic called stock
17  certificates. Were you ever given any stock
18  certificates?
19  A   No.
20  Q   And there were no other managers of the
21  clinic the entire time that you were there. Correct?
22  A   Could you repeat that again?
23  Q   Sure. During the time that you worked at
24  Caleb as manager, were there any other managers too?
25  A   No.

Page 32

1   Q   Do you know where Caleb got its equipment and
2   furniture and supplies from?
3   A   No.
4   Q   Were you involved in that process at all?
5   A   No.
6   Q   Did Caleb own any vehicles?
7   A   No.
8   Q   Were you provided a vehicle by Caleb?
9   A   No.
10  Q   Were you provided a vehicle by anyone
11  associated with Caleb?
12  A   What's the situation there?
13  Q   Were you given a vehicle by anyone that had
14  anything to do with Caleb?
15  A   No.
16  Q   Did Caleb have professional liability
17  insurance?
18  A   Could you explain that?
19  Q   Did Caleb have any insurance policies?
20  A   Yes, of course.
21  Q   What type of insurance?
22  A   It's the insurance that any company has
23  regarding for any type of accidents or work related.
24  What the law requires.
25  Q   Did you obtain that insurance for the clinic?

Page 33

1   A   Well, that, Dr. Sara Vizcay had it.
2   Q   Did you assist with obtaining any insurance
3   for the clinic?
4   A   What do you mean by me helping?
5   Q   When you were serving as manager of Caleb,
6   did you do anything to get insurance for Caleb? Was
7   that part of your job?
8   A   Well, the part that was my duty was to pay
9   for the insurance.
10  Q   So you issued the check for it?
11  A   Uh-huh.
12  Q   Is that yes?
13  A   Yes. Yes.
14  Q   Was that a check issued from Caleb's bank
15  account?
16  A   Yes.
17  Q   Were you involved in applying for the
18  insurance?
19  A   No.
20  Q   Were you involved in any other aspect of
21  obtaining the insurance besides issuing the check?
22  A   How's that?
23  Q   In terms of the insurance policy that Caleb
24  had, is there anything else that you did in order to
25  get that insurance or did you just issue the check?

9  (Pages 30 to 33)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 34

1    A   No. I would only do the check.
2    Q   The people that you worked with at Caleb, did
3  you ever work with any of them at any other business?
4    A   No.
5    Q   Was Caleb solely an automobile accident
6  clinic that treated patients involved in car accidents?
7    A   Yes.
8    Q   Are you aware of any of the laws in Florida
9  regarding who can own a clinic like Caleb, like an auto
10  accident clinic?
11    A   No.
12    Q   Did you ever hear any discussion regarding
13  the ownership of Caleb and who would be permitted to
14  own it under the law?
15    A   Really those are things that did not interest
16  me since I'm not the owner of anything. I'm simply a
17  person who worked there.
18    Q   Do you know the date that Caleb was formed,
19  when it started?
20    A   I really don't know.
21    Q   Do you know who filled out the paperwork in
22  order to start up the clinic?
23    A   I don't know.
24    Q   Do you know who paid the filing fee to start
25  the clinic?

Page 35

1    A   I don't know.
2    Q   Were you ever listed on the paperwork filed
3  with the State for the clinic to show who's a director
4  or officer?
5    A   No, I don't think so.
6    Q   Did you ever handle preparing or filing the
7  annual reports for Caleb?
8    A   Could you explain that to me again?
9    Q   Yes. Each year corporations file a report
10  with the State called an annual report. Did you ever
11  file any annual reports for Caleb or assist with
12  preparing those reports?
13    A   In other words, is she talking about the tax
14  forms?
15    Q   Not the tax forms, but with the State of
16  Florida for the corporation. Did you file any of the
17  reports related to the corporation?
18    A   No.
19    Q   Did you file any paperwork related to the
20  taxes?
21    A   For the taxes, yes. I would go — I would
22  take the papers to the accountant, and he would handle
23  that.
24    Q   Did you sign the tax returns for the
25  corporation?

Page 36

1    A   Correct.
2    Q   Did you sign them each year that you worked
3  there?
4    A   Yes.
5    Q   Did Dr. Vizcay ever sign the taxes while you
6  were working there?
7    A   Well, she had to sign parts of that work --
8  of those taxes.
9    Q   Did you ever participate in any meetings for
10  Caleb, like corporate meetings, where the officers and
11  directors would get together and talk about the
12  business?
13    A   I'd rather not talk about that since I don't
14  consider it has any importance.
15    Q   So you're not going to answer that question?
16    A   No.
17    Q   Who attended corporate meetings for Caleb?
18    A   Well, Dr. Vizcay would meet with me, like I
19  explained earlier, and would guide me.
20    Q   Did anyone else attend those meetings?
21    A   No.
22    Q   Did Caleb have any cash that it kept to use
23  for expenses at the clinic?
24    A   How's that?
25    Q   When you were at Caleb was there any cash

Page 37

1  that was kept to use for expenses related to the
2  clinic?
3    A   Well, things like that I believe you should
4  ask Dr. Vizcay. She's the owner of the clinic. She's
5  the owner of the account. And I have no right to talk
6  about private things of the clinic or of that account.
7    Q   Okay. You were a manager of the clinic. I'm
8  asking you as manager of the clinic, was there cash
9  that you would keep to use for the clinic?
10    A   No.
11    Q   Did you ever take any cash out of Caleb's
12  bank account?
13    A   Those things I'm not going to answer.
14    Q   So you're not going to answer if you took
15  cash out of Caleb's bank account?
16    A   No. You can ask her that. Those are her
17  private things which I don't believe I have the right
18  to talk about.
19    Q   I'm not asking you if Vizcay took out cash.
20  I'm asking if you took cash out of Caleb's bank
21  account.
22    A   I'm already answering. I have no right to
23  answer that since it's not my account, nor my money,
24  and you're asking me.
25    Q   Did you ever cash any checks for Caleb?

10   (Pages 34 to 37)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)                    5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 38

1    A   What does that mean?
2    Q   Did you ever -- was there ever a check that
3  was written out to Caleb and you took it to the bank
4  and you got money in exchange for that check?
5    A   No.
6    Q   While you were a manager at Caleb what banks
7  did you use for Caleb's business?
8    A   I also do not think that that's important for
9  this.
10   Q   You're not going to answer the question?
11   A   No.
12   Q   Did you ever participate in opening a bank
13 account for Caleb?
14   A   I also cannot answer the question.
15   Q   Did you sign any of the paperwork with a bank
16 for a bank account for Caleb?
17   A   I cannot answer the question.
18   Q   You cannot answer the question, or you're not
19 willing to answer the question?
20   A   No, no. I'm not going to answer it.
21   Q   Who had access to Caleb's banking records?
22   A   Regarding that, I don't want to talk anything
23 about accounts. Those are Dr. Vizcay's problems.
24   Q   So you're not going to answer that question?
25   A   No.

Page 39

1    Q   Who balanced the checkbook for Caleb every
2  month?
3    A   Neither.
4    Q   Meaning you're not going to answer the
5  question?
6    A   No.
7    Q   Did you ever use online banking to do
8  transactions for Caleb?
9    A   No.
10   Q   Did you have a debit card for Caleb?
11   A   Yes.
12   Q   Did Caleb receive its bank statements --
13 strike that.
14       Did you ever have a credit card for Caleb?
15   A   How can that be explained?
16   Q   Did you ever have a credit card that was in
17 the name of Caleb that you were able to use?
18   A   No.
19   Q   Did you ever have a credit card that had your
20 name on it but it was paid by Caleb?
21   A   Well, a card from the bank account, but not a
22 credit card.
23   Q   The only card that you had with your name on
24 it that related to Caleb, was that just that debit
25 card?

Page 40

1    A   Uh-huh. Yes.
2    Q   Who else had a debit card for Caleb?
3    A   Well, I imagine that Dr. Vizcay would have
4  one.
5    Q   Do you know that she had one?
6    A   No.
7    Q   Was there anyone else that had a debit card
8  for Caleb?
9    A   No.
10   Q   Could you write yourself a check out of
11 Caleb's account?
12   A   Yes.
13   Q   Did you ever write yourself a check out of
14 Caleb's account?
15   A   Yes. I would do it, because I was the
16 administrator, but to pay -- do my payment.
17   Q   So when you received your salary, was that --
18 you wrote yourself a check from Caleb?
19   A   Yes. Under the authorization of Dr. Vizcay.
20   Q   And did you sign your own check?
21   A   Yes.
22   Q   Other than your salary did you ever write
23 yourself a check from Caleb?
24   A   No.
25   Q   And were you authorized to write checks on

Page 41

1  behalf of Caleb?
2    A   Yes.
3    Q   Was anyone else authorized to write checks on
4  behalf of Caleb?
5    A   No.
6    Q   Did you ever go to the bank for Caleb?
7    A   I did.
8    Q   How often?
9    A   Well, many times.
10   Q   Did anyone else ever go to the bank for
11 Caleb?
12   A   No.
13   Q   Who handled depositing the money that was
14 paid to Caleb?
15   A   Well, I did.
16   Q   Did anyone else handle that?
17   A   Well, the -- now that -- the doctor.
18   Q   What did the doctor do in terms of handling
19 the deposits? What role did she play?
20   A   Well, I had to speak with her and make her
21 aware of the income of the payments for the week.
22   Q   So each week would you tell Dr. Vizcay how
23 much money came into the clinic?
24   A   Exactly.
25       MS. DENBO: We're going off the record to

11   (Pages 38 to 41)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 42

1    change tapes.
2        THE VIDEO OPERATOR: 10:27 a.m.
3        (Deposition recessed 10:27 a.m. to 10:40
4    a.m.)
5        THE VIDEO OPERATOR: We are back on the
6    record. The time is 10:40 a.m.
7    BY MS. DENBO:
8        Q   When we went off the record we were talking
9    about Caleb and who handled the banking for Caleb. And
10   you had said that at the end of each week you would
11   advise Dr. Vizcay of the income that came into the
12   clinic, how much it was. And then you would handle
13   depositing it. Is that correct?
14       A   Yes.
15       Q   Who recorded the deposits? Meaning who wrote
16   down what they were in the records at the clinic?
17       A   I did that. In other words, you're talking
18   about making the bank deposit?
19       Q   Right.
20       A   Uh-huh.
21       Q   And you would be the one that would write
22   down or enter into a computer how much was deposited?
23       A   No.
24       Q   Okay. Explain.
25       A   The secretary would do that. But that was

Page 43

1    done by Dr. Vizcay. I would hand her the papers, and
2    she would handle that.
3        Q   Who was the secretary?
4        A   Who was it? What do you want to know? The
5    name?
6        Q   Yes.
7        A   Vanessa Perez.
8        Q   Was she someone that worked full time at
9    Caleb?
10       A   Yes.
11       Q   Did she work there the entire time that you
12   worked there?
13       A   No. There were other persons who worked
14   there before she did.
15       Q   When Caleb would receive checks who signed
16   the back of the checks on behalf of the clinic?
17       A   The corporation.
18       Q   But who signed it?
19       A   The corporation.
20       Q   Did a person take a pen and --
21       A   The corporation, the stamp.
22       Q   Okay. So it was a stamp?
23       A   Yes.
24       Q   Who used the stamp for the corporation to put
25   that stamp on the back of the check?

Page 44

1        A   I did.
2        Q   Did anyone else have authorization to use
3    that stamp?
4        A   No.
5        Q   Do you know who obtained -- go ahead.
6        A   Excuse me. Let me explain something.
7        Q   Okay.
8        A   Aside from Dr. Vizcay and me, no one else.
9    Okay?
10       Q   Was involved with the banking records you're
11   talking about?
12       A   Who? Her? Dr. Vizcay? She's the owner.
13       Q   And nobody else was involved in the banking?
14       A   No. One --
15       Q   Who obtained the tax identification number
16   from the IRS for Caleb?
17       A   I don't know. I imagine she did. I don't
18   know.
19       Q   Did Caleb have more than one tax
20   identification number?
21       A   No.
22       Q   Did Caleb file tax returns each year that you
23   worked there?
24       A   In other words, the tax return. Is that what
25   you're asking me?

Page 45

1        Q   Right.
2        A   Yes. Everything was done every year.
3        Q   Did Caleb just do tax returns at the end of
4    the year, or were they done quarterly?
5        A   No. That was -- at the end of the year
6    everything was done.
7        Q   And you were the one that gave the accountant
8    all of the records from Caleb in order to do the taxes?
9        A   Exactly.
10       Q   Did you ever do the taxes on your own without
11   using an accountant?
12       A   In other words, you're telling me that if I
13   myself prepared the taxes for the corporation?
14       Q   Correct. For any year.
15       A   No.
16       Q   Who selected which accountant would be used?
17       A   Dr. Vizcay.
18       Q   When you were paid by Caleb were you given a
19   W-2 or a 1099 to show those payments?
20       A   A W-2.
21       Q   Did you ever receive a 1099 from Caleb?
22       A   No.
23       Q   Did you ever receive a K-1 from Caleb?
24       A   No.
25       Q   Is the only type of form you received from

12  (Pages 42 to 45)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)                          5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 46

1  Caleb then the W-2?
2      A  Correct.
3      Q  Did Caleb use a payroll company that would
4  assist with determining the taxes and what needed to be
5  taken out of checks?
6      A  Could you explain that again?
7      Q  Did Caleb utilize any type of a company, like
8  a payroll company, that would assist with determining
9  amounts that had to be taken out of someone's pay, like
10  taxes, social security, Medicare, anything like that?
11     A  No.  That, the accountant would do.
12     Q  As manager of Caleb explain to me what your
13  day-to-day duties were.
14     A  Well, I -- what I would do is try to look for
15  things that were needed.  Supplies for the office,
16  supplies for the medical equipment, the bank things,
17  take the deposits, advertisement, things like that.
18     Q  Were you the person that was primarily
19  responsible for decisions that were not related to
20  medicine?
21     A  No.  The decisions -- one would really have
22  to count with Dr. Vizcay since she was the owner.  You
23  would have to count on her.  She was the one who would
24  make the decisions or guide you as to which route to
25  take.

Page 47

1      Q  Did Dr. Vizcay ever sign any of the checks,
2  like the bank checks, for payments to anyone?
3      A  I don't think so.  I don't know.  I don't
4  think so.
5      Q  Who was responsible for determining how much
6  each person would get paid every two weeks?
7      A  She was.
8      Q  Dr. Vizcay?
9      A  Uh-huh.  Yes.
10     Q  Who had access to Caleb's financial
11  information besides yourself and Vizcay?
12     A  No, no one.
13     Q  But Dr. Vizcay did have access to the
14  financials?
15     A  Of course.  Yes.  Truly.
16     Q  And you said you were responsible for
17  marketing?
18     A  In other words, the advertising for the
19  clinic.  Is that what she's talking about?
20     Q  Yes.
21     A  That's correct.
22     Q  Did Dr. Vizcay assist with advertising?
23     A  Well, practically speaking, I did all of
24  those things.
25     Q  But not Dr. Vizcay for advertising.  Right?

Page 48

1      A  No.
2      Q  Did you ever utilize the services of First
3  Choice Advertisement, Incorporated?
4      A  That, you would have to ask her.
5      Q  Did you, though?  You said you handled the
6  advertising.  Did you ever use First Choice
7  Advertisement, Inc.?
8      A  No.  No.
9      Q  Do you know if Dr. Vizcay did?
10     A  I don't know.  I don't know if she would
11  have.
12     Q  Are you familiar with that company?
13     A  No.
14     Q  Do you know Bryan Toledo?
15     A  I'd rather not talk about that situation.
16  I'm not going to answer any of that.
17     Q  So you're not going to answer the question as
18  to if you know Bryan Toledo?
19     A  No.  Because that's a third party and has
20  nothing to do with this or would want to, I think.
21     Q  Do you know if First Choice Advertisement,
22  Inc., is Bryan Toledo's company?
23     A  I don't know.
24     Q  Do you have any business relationship with
25  Bryan Toledo?

Page 49

1      A  I'm not going to answer any of that.
2      Q  So you're not going to answer the question as
3  to if you have any business relationship with Bryan?
4      A  No.
5      Q  Was the name of the clinic, Caleb, on the
6  signs outside of the clinic?
7      A  Yes.
8      Q  Did you have an office inside Caleb?
9      A  Yes.  There was an office there.
10     Q  Did your office lock?
11     A  The office, yes.
12     Q  Who had a key to your office?
13     A  I had it.
14     Q  Did anyone else have a key to your office?
15     A  The doctor.
16     Q  What was maintained inside your office?
17     A  In the office?  Some papers.  Work contract
18  papers, for example.
19     Q  How about like the checkbooks, the financial
20  information?  Was that maintained in your office?
21     A  The checkbook, no.
22     Q  Where was the checkbook kept?
23     A  The doctor would bring it.
24     Q  Did Dr. Vizcay have an office at Caleb?
25     A  The same office.

13  (Pages  46 to 49)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 50

1    Q    The same office as yours?
2    A    Yes.
3    Q    You guys shared an office?
4    A    Yes.
5    Q    Did she have a separate office that was her
6    own office?
7    A    No.
8    Q    Did Dr. Vizcay keep any personal belongings
9    in that office?
10   A    No.
11   Q    If you would leave the clinic during the day
12   while it was open, would you lock your office?
13   A    Yes. I'd lock it.
14   Q    Whose -- who determined what days and hours
15   the clinic would be open?
16   A    Dr. Vizcay.
17   Q    Who would arrive first at the clinic and
18   unlock the door and open the clinic in the mornings?
19   A    I would.
20   Q    Who would close the clinic at the end of the
21   day?
22   A    Many times me. But the secretary herself
23   would -- many times would close it.
24   Q    Did the secretary have a key to the clinic?
25   A    She also had a key.

Page 51

1    Q    Did you ever hire any employees for the
2    clinic?
3    A    No.
4    Q    Did you ever go find people to work at the
5    clinic?
6    A    No.
7    Q    Did you ever interview anyone to work at the
8    clinic?
9    A    No.
10   Q    Does the clinic have an application that
11   somebody fills out if they want to work there?
12   A    I imagine so. I don't know.
13   Q    So you never hired anyone to work at the
14   clinic as an employee or an independent contractor?
15   A    No.
16   Q    Did you ever fire anyone?
17   A    Dr. Vizcay would do that.
18   Q    Who would handle all of the hiring?
19   A    Well, she would handle that.
20   Q    Was there anyone else besides Dr. Vizcay that
21   would handle the hiring or firing at Caleb?
22   A    The what?
23   Q    Was there anyone else that would handle the
24   hiring or firing of employees or independent
25   contractors at Caleb?

Page 52

1    A    No.
2    Q    Did Caleb have written contracts with
3    everyone that worked there?
4    A    Yes.
5    Q    Did you ever handle entering into any
6    contracts on behalf of Caleb? And that could be
7    contracts with employees or contracts with companies
8    you were going to use, maybe a power company, anything
9    like that.
10   A    No.
11   Q    Say it out loud.
12   A    No.
13   Q    Did you play any role in determining where
14   Caleb would be located?
15   A    How's that?
16   Q    Were you part of the decision to determine
17   where Caleb would have its clinic, where its building
18   would be?
19   A    I don't understand that question.
20   Q    Okay. What address was Caleb located at?
21   A    At 3105 West Waters, Suite 304.
22   Q    Was it always at that location while you were
23   there?
24   A    Yes.
25   Q    Did you help determine that Caleb would be at

Page 53

1    that location -- at 3105 West Waters?
2    A    No.
3    Q    Who decided where it would be?
4    A    I don't know.
5    Q    Did you ever sign the lease at 3105 West
6    Waters?
7    A    The rental lease?
8    Q    Correct.
9    A    Yes, I think so.
10   Q    And Caleb always leased the property there.
11   It didn't own it. Correct?
12   A    Correct.
13   Q    Did you sign the lease each year that you
14   were there at Caleb?
15   A    In the time that I was there, yes. Both.
16   Both had to sign. Dr. Vizcay and me.
17   Q    So you and Dr. Vizcay signed the lease each
18   year together?
19   A    Yes.
20   Q    Who did you lease the property from? Who was
21   the landlord?
22   A    Well, the company, I think it was called
23   Prudential or something like that.
24   Q    Did Caleb have a post office box?
25   A    No.

14  (Pages 50 to 53)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)                5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 54

1    Q   Whose decision was it as to where patients
2    would be sent if they needed something like an X-ray or
3    an MRI?
4    A   Those things, I don't know anything about
5    that. The medical part, the medical operations, I
6    don't know anything about that.
7    Q   Okay. And I'm not talking about who would
8    determine if an X-ray was needed by the patient. But,
9    for example, say a doctor said a patient needs to get
10   an X-ray. Who at Caleb would tell them which business
11   to go to to get that X-ray?
12   A   I don't know. That's a matter of the medical
13   part. I imagine that the patient would go where he
14   would wish to go, but I don't know. That part of the
15   medical operation, I don't know.
16   Q   Did you ever determine which companies Caleb
17   would send patients to in order to get testing done?
18   A   No. I never determined any of that.
19   Q   Did you play any supervisory role at Caleb?
20   A   Can she explain better?
21   Q   Yes. While at Caleb were you responsible for
22   supervising anybody that worked there? Watching over
23   what they did, making sure they were doing their jobs
24   right?
25   A   No.

Page 55

1    Q   Who would supervise the people that worked at
2    Caleb?
3    A   Well --
4        MS. DENBO: Off the record. We just had a
5        quick power outage, so we have to make -- that
6        means the phone's off too. Okay. Off the record.
7        (Off the record to reconnect the conference
8        call 11:02 a.m. to 11:03 a.m.)
9        THE VIDEO OPERATOR: Back on the record at
10       11:03 a.m.
11   BY MS. DENBO:
12   Q   When we went off the record we were talking
13   about supervision at Caleb. And I was asking who was
14   responsible for supervising anybody that worked at
15   Caleb. And I believe you were just getting ready to
16   answer.
17   A   Well, Dr. Vizcay, she would supervise. Since
18   she's the owner and director, she's the one who had the
19   responsibility of checking the work and all of the
20   things related to the medical side.
21   Q   Did you see her supervising employees, or are
22   you guessing that that's what she did?
23   A   Well, I suppose that's what she would do.
24   Q   Okay. But it's not something you actually
25   saw. You're telling me what you think she probably

Page 56

1    did?
2    A   Well, I think she would do it and well,
3    because she was always checking everything. Because I
4    can't talk about the medical part, because I'm not
5    licensed in any of that. And nor can I supervise
6    therapies. Nor can I supervise things like that,
7    because I don't know those things. My things were
8    administrative problems.
9    Q   Did you ever make any type of a payment of
10   money to a patient at the clinic?
11   A   Patient or what? How's that question?
12   Q   Yes. Did you ever pay any money to a patient
13   at Caleb?
14   A   No.
15   Q   Did you ever give a gift to any patient at
16   Caleb?
17   A   No.
18   Q   Did you ever hear of somebody else doing that
19   at Caleb?
20   A   No.
21   Q   Have you ever personally been involved in a
22   car accident where you had to get medical treatment?
23   A   Me? Many years ago I believe I had an
24   accident.
25   Q   Was that in the U.S.?

Page 57

1    A   Yes.
2    Q   Did you ever treat at a clinic where
3    Dr. Vizcay worked?
4    A   No.
5    Q   Did you ever treat at Caleb?
6    A   No.
7    Q   How many times have you been involved in a
8    car accident in the United States?
9    A   I think that two times, it seems.
10   Q   And I believe we had said before that at
11   Caleb all of the patients were car-accident patients.
12   Right?
13   A   I think so. I don't really know.
14   Q   Do you ever recall coming across a patient
15   chart or a patient who was not in a car accident but
16   was treating at Caleb?
17   A   Explain that to me again.
18   Q   You said that you believe that all of the
19   patients at Caleb were auto-accident patients. Do you
20   ever recall a time where you learned of a patient
21   treating at Caleb that had not been in a car accident?
22   A   No, no. I don't know. I don't remember
23   that.
24   Q   Did Caleb accept Medicare?
25   A   I don't know.

15   (Pages 54 to 57)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 58

```
1    Q   Or Medicaid?
2    A   I don't know.
3    Q   Health insurance?
4    A   I don't know.
5    Q   Workers' compensation?
6    A   I don't know. No.
7    Q   Did Caleb collect payments from the patients?
8    A   Yes. I think so, yes.
9    Q   Were those cash payments, credit card, check?
10   Like what form of payments were accepted from patients?
11   A   Well, I think there's a -- I think there's a
12   20 percent that they have to pay. So then they would
13   do like some type of payment arrangement and pay by
14   check, sometimes cash.
15   Q   So Caleb accepted check, cash. Did Caleb
16   accept credit card payments?
17   A   Credit card, no. No.
18   Q   Approximately how many patients were seen a
19   day at Caleb during the time that you worked there?
20   A   I don't know.
21   Q   Can you give me a range like around 10, maybe
22   20, maybe 50, some idea?
23   A   No. I don't know. I don't know. I see
24   sometimes two people, three people.
25   Q   Two to three per day?
```

Page 59

```
1    A   I'm not saying that's it. I'm saying what
2    I'd see there. I don't know if they were coming to --
3    for their treatment, for their therapies, for their
4    treatment, or to see the doctor.
5    Q   When you were working at Caleb where were the
6    medical records kept? Were they kept right there in
7    the clinic?
8    A   Yes.
9    Q   Were they kept like actual papers, or was it
10   just something that was in a computer system?
11   A   No. On paper. They had like a -- I think
12   it's a chart. And in there they have all of their
13   treatments, their record.
14   Q   While you were working at Caleb, list for me
15   the people that worked there. I know we talked about
16   Vanessa Perez, I think her name was. Is that correct?
17   A   Uh-huh.
18   Q   And Dr. Vizcay. Who else worked at Caleb
19   during the time that you worked there?
20   A   Well, several people worked there, but -- and
21   other doctors. But I don't remember since I didn't
22   have a --
23   Q   Do you remember the names of anyone else that
24   worked at Caleb during the time that you worked there
25   besides Dr. Vizcay and Vanessa Perez?
```

Page 60

```
1    A   Jose Lopez.
2    Q   Any others?
3    A   No. I don't remember.
4    Q   What was Jose Lopez's role?
5    A   He was a therapist.
6    Q   Did you ever work with Jose Lopez anywhere
7    else?
8    A   No.
9    Q   Did Jose Lopez work at Caleb the entire time
10   that you worked there?
11   A   No.
12   Q   What other therapists worked at Caleb while
13   you were there?
14   A   Several people worked there, but I don't
15   remember the names. Since I didn't have to, you know,
16   deal with them or anything like that, I wasn't
17   interested in that part.
18   Q   Do you remember the names of any other
19   doctors that worked at Caleb?
20   A   No.
21   Q   Have you ever read the complaint that was
22   filed in this case by Allstate?
23   A   No.
24   Q   Do you know Norge, N-o-r-g-e, Romero,
25   R-o-m-e-r-o?
```

Page 61

```
1    A   No.
2    Q   Do you know Daniel O'Callahan?
3    A   No.
4    Q   Do you know Dina Toledano Castellon,
5    T-o-l-e-d-a-n-o C-a-s-t-e-l-l-o-n?
6    A   No.
7    Q   Do you know Heather Green?
8    A   No.
9    Q   Do you know Miguel Moreno Cardenas,
10   M-o-r-e-n-o C-a-r-d-e-n-a-s?
11   A   No.
12   Q   Do you know Arrianne Rodriguez Tejada?
13   A   No.
14       MS. DENBO: For the court reporter,
15   A-r-r-i-a-n-n-e, Rodriguez Tejada, T-e-j-a-d-a.
16   BY MS. DENBO:
17   Q   Do you know Malbert Paez?
18   A   No.
19   Q   M-a-l-b-e-r-t P-a-e-z. Do you know Ariel
20   Santos?
21   A   No.
22   Q   Do you know Enrique Toledo?
23   A   No.
24   Q   Do you know if Bryan Toledo is related to
25   Enrique Toledo?
```

16  (Pages 58 to 61)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Eusebio Manuel Aquino - 9/24/2012

Page 62

1    A  I don't know.
2    Q  Did you ever live at the address 6410
3  Axelrod, A-x-e-l-r-o-d?
4    A  No.
5    Q  Do you know Dailin, D-a-i-l-i-n, Rojas,
6  R-o-j-a-s?
7    A  No.
8    Q  Did you ever meet her while she was living on
9  Silver Sage in your neighborhood?
10   A  Who?
11   Q  Dailin, D-a-i-l-i-n, Rojas, and also the last
12 name Perez.
13   A  No.
14   Q  Or Daysi Rojas, D-a-y-s-i?
15   A  No.
16   Q  And it appears that Bryan Toledo also lived
17 in your neighborhood.  Did you know him from your
18 neighborhood?
19   A  Regarding Bryan Toledo, I don't want to speak
20 anything about him.  I do know him.
21   Q  How about Zoila, Z-o-i-l-a, Perez Paserio,
22 P-a-s-e-r-i-o?  Did you know Zoila from your
23 neighborhood?
24   A  No.
25   Q  Or Arelys Ortega, A-r-e-l-y-s O-r-t-e-g-a?

Page 63

1    A  No.
2    Q  Do you know Jorge Valiz, V-a-l-i-z, Mateo,
3  M-a-t-e-o?
4    A  No.
5    Q  Or Jorge Vazquez, V-a-z-q-u-e-z?
6    A  No.
7    Q  Martha Vazquez?
8    A  No.
9    Q  Do you know Angel Diaz?
10   A  No.
11   Q  Never met Angel Diaz?
12   A  No.
13   Q  Have you been involved in any type of
14 businesses with Angel Diaz?
15   A  I just said I don't know him.
16   Q  Do you know Danai Diaz, D-a-n-a-i?
17   A  No.
18   Q  Or Artenio Acosta, A-r-t-e-n-i-o A-c-o-s-t-a?
19   A  No.
20   Q  Or Arelys Rubio, A-r-e-l-y-s R-u-b-i-o?
21   A  No.
22   Q  So is Bryan Toledo the only person that you
23 know that lives in your neighborhood?
24   A  Yes.
25   Q  Do you know Jaqueline Quinones Rojas,

Page 64

1  Q-u-i-n-o-n-e-s, Rojas, R-o-j-a-s?
2    A  No.
3    Q  Do you know Armando Angulo?
4    A  No.
5    Q  Did you ever participate in the purchase or
6  sale of any property or homes with any of those people
7  that we just named?
8    A  No.
9    Q  Are any of those people associated with Caleb
10 Health Care?
11   A  No.
12   Q  And I have several questions regarding how
13 you know Bryan Toledo and your relationship with him.
14 I just want to clarify, because you've said you don't
15 want to answer any questions about Bryan.  Usually
16 we're required to go through every single question.
17 I'm not going to go through every single question if
18 you tell me that you're answering nothing related to
19 him.  But if there may be some questions you're willing
20 to answer about Bryan Toledo, I'll go ahead and ask
21 every question.
22   A  No.
23   Q  So you are refusing to answer any type of
24 question pertaining to Bryan Toledo.  Is that correct?
25   A  Yes.

Page 65

1    Q  So I don't need to go through every question
2  right now?
3    A  No.
4    Q  Do you know Lien Perez, L-i-e-n?
5    A  How's that?  Repeat that again.
6    Q  Lien Perez.  Do you know her?
7    A  Lien Perez.  Right?  She was a secretary
8  there.
9    Q  Secretary at Caleb?
10   A  Uh-huh.  Yes.
11   Q  When did she work there?
12   A  She worked — I don't remember well if it
13 was — I don't remember.  I don't remember the period
14 of time.  And so as to not say something that's not
15 correct, I —
16   Q  Do you know if — was she working at Caleb
17 when you first started working there?
18   A  No.
19   Q  Did you know her outside of Caleb?
20   A  No.
21   Q  So you met her at Caleb?
22   A  Yes.
23   Q  Are you related to her?
24   A  No.
25   Q  Who hired her?

17 (Pages 62 to 65)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Eusebio Manuel Aquino - 9/24/2012

Page 66

1   A   I imagine that Dr. Vizcay. I don't know.
2   Q   Are you aware of any other clinics where Lien
3   has worked?
4   A   No.
5   Q   Had you ever worked with her anywhere else
6   either before you started at Caleb or after?
7   A   No.
8   Q   Do you share in any investments with her?
9   A   No.
10  Q   Did you ever purchase any type of property or
11  a home or a business from her?
12  A   No.
13  Q   Did you ever sell property, a home, or a
14  business to her?
15  A   No.
16  Q   Do you know where she works now?
17  A   No.
18  Q   What was her role at Caleb?
19  A   She was a secretary.
20  Q   And what did that mean? What did the
21  secretary do at Caleb?
22  A   Really I don't know, because that there had
23  to do with Dr. Vizcay and the medical things.
24  Q   Do you know if she was an independent
25  contractor or an employee?

Page 67

1   A   I don't know.
2   Q   What was her work schedule?
3   A   Well, the work schedule was the same so long
4   as the clinic were open. From 9:00 in the morning
5   until 6:00 or 7:00 or until operations ceased.
6   Q   Is that when Lien worked? She worked full
7   time?
8   A   Yes.
9   Q   Did she ever have any ownership interest in
10  Caleb?
11  A   No.
12  Q   Was she still working at Caleb when you left?
13  A   No.
14  Q   Do you know if she quit or was fired?
15  A   I really don't know. I think she was
16  pregnant and gave birth, seems to me.
17  Q   And you said you know Jose Lopez. He was a
18  therapist at the clinic?
19  A   In other words, I met him there.
20  Q   Was he already working at Caleb when you
21  started?
22  A   No. I don't think so.
23  Q   Did he leave before you did?
24  A   Yes.
25  Q   Do you know if he quit or was fired?

Page 68

1   A   I don't know.
2   Q   Do you know if he quit without notice, like
3   he just didn't come back?
4   A   I don't know.
5   Q   Did you know Jose Lopez outside of Caleb?
6   A   No.
7   Q   Are you related to him?
8   A   No.
9   Q   Are you aware of any other clinics where he
10  worked?
11  A   No.
12  Q   Did you ever work with him anywhere else
13  besides Caleb?
14  A   No.
15  Q   Did you share in any investments with him?
16  A   No.
17  Q   Did you ever purchase property or a home from
18  him or sell one to him?
19  A   No.
20  Q   Any idea where he works now?
21  A   No, I don't know.
22  Q   Was his only role at the clinic providing
23  therapy to the patients, or did he do something else?
24  A   I don't know, because I didn't handle those
25  things.

Page 69

1   Q   Was he a full-time?
2   A   I imagine so.
3   Q   Did you hire him?
4   A   No.
5   Q   Did he have any ownership interest in Caleb?
6   A   No.
7   Q   Who determined how much he would be paid?
8   A   Dr. Vizcay.
9   Q   Did another therapist replace him after he
10  left?
11  A   Yes. Others came.
12  Q   Do you know who replaced him?
13  A   I really don't remember the name.
14  Q   Was there a period of time where he left and
15  there wasn't a therapist at the clinic?
16  A   No, I don't think so.
17  Q   Do you know Anthony Esposito, the
18  chiropractor, E-s-p-o-s-i-t-o?
19  A   No.
20  Q   Did he work at Caleb while you were there?
21  A   I don't know. It's possible that from the
22  doctors that went there, it would have been another
23  doctor.
24  Q   Did you interact with the doctors at all at
25  Caleb besides Dr. Vizcay?

18  (Pages 66 to 69)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Eusebio Manuel Aquino - 9/24/2012

Page 70

1    A   No.  No.
2    Q   Do you know Chiropractor Jason Miller?
3    A   I don't know.  No.  By the name, I don't
4   know.  Perhaps if I see him, I know who it is.
5    Q   Do you know Chiropractor Timothy Johnson?
6    A   No, I don't know.
7    Q   Do you know how it came about that Dr. Vizcay
8   worked at Caleb?
9    A   How's that question?
10   Q   Do you know how Dr. Vizcay came to work at
11  Caleb?
12   A   I don't understand the question.
13   Q   Okay.  You said that you've known Vizcay
14  since you came to the United States.  Correct?
15   A   Uh-huh.
16   Q   Do you know --
17   A   Yes.
18   Q   Do you know how it came about that she
19  started working at Caleb?
20   A   No.
21   Q   How was Dr. Vizcay paid for her work at
22  Caleb?
23   A   I don't want to speak about that either.
24   Q   Okay.  So you're refusing to answer the
25  question as to how Dr. Vizcay was paid at Caleb?

Page 71

1    A   Yes.  You can ask her attorney if you'd like.
2    Q   How frequently was Dr. Vizcay paid from
3   Caleb?
4    A   I already said that I don't want to talk
5   about those things.
6    Q   So you're not going to answer that question?
7    A   No.
8    Q   What was Dr. Vizcay compensated for by Caleb?
9    A   How's that question?
10   Q   When Dr. Vizcay was paid by Caleb, what was
11  she paid for?
12   A   Me?
13   Q   Dr. Vizcay.
14   A   We're not going to talk about that.
15   Q   You're not going to answer the question?
16   A   No.
17   Q   What was Dr. Vizcay's duties at Caleb?  What
18  did she do on a daily basis?
19   A   Well, her job, she would do it.  I'm not a
20  supervisor to supervise her.  I was simply a worker
21  there.  Those things you can ask her attorney who's
22  there on the line.
23   Q   Who determined how much Dr. Vizcay was going
24  to be paid by Caleb?
25   A   No.

Page 72

1    Q   Does that "no" mean no, you're not going to
2   answer the question?
3    A   No.
4    Q   I just need to clarify that you're not going
5   to answer the question.  Correct?
6    A   No.
7    Q   What was Dr. Vizcay's work schedule at Caleb?
8   Like what days and hours?
9    A   She's the owner of the -- of the -- of there.
10  Her schedule is different than mine or the workers.
11  It's an open schedule.
12   Q   Were there particular days that you knew she
13  would always come in on this day at this time?
14   A   Well, yes.  She would come on Mondays.
15   Q   At what time?
16   A   At 9:00.
17   Q   9 a.m. until when?
18   A   Uh-huh.  Until she would see or give the
19  consultation to the patients or did all the work that
20  she had to do there.
21   Q   About what time would she be done?  Was it a
22  half day, a full day?
23   A   Some days she would leave there at 7:00 at
24  night.
25   Q   Did she work any other days at Caleb?

Page 73

1    A   She would also go on Fridays.
2    Q   What time?
3    A   Also at around 9:00.
4    Q   Until when?
5    A   It was not a fixed schedule.
6    Q   Was it more like a half day or full day?
7    A   If I'm telling you that it wasn't a -- you're
8   telling me a fixed schedule, and I'm telling you I
9   don't remember exactly what time.
10   Q   When Dr. Vizcay came to Caleb did she always
11  see patients, or were there times that she came into
12  the clinic to do something else?
13   A   No.  She would come during the week.  She
14  would come sometimes to check other things, other
15  things she had to do, and to meet with me to give me
16  instructions for things that had to be done.
17   Q   Did Dr. Vizcay ever serve as medical director
18  of Caleb?
19   A   I don't understand that question.
20   Q   In Florida sometimes doctors serve as
21  something, and it's called a medical director.  Do you
22  know if Dr. Vizcay served as a medical director for
23  Caleb?
24   A   You can ask her that or her attorney.
25   Q   Are you refusing to answer that question?

19 (Pages 70 to 73)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 74

1    A   It's not that I'm refusing. I don't know it.
2    Q   Okay.
3    A   I imagine. She was the owner and director.
4    Q   And I'm glad you clarified that, because I do
5    need to know the difference between when you don't know
6    something or when you know, but you're just not going
7    to answer. So I'm glad you clarified that.
8    A   No. Because you're asking me questions that
9    really don't concern me regarding what I did there.
10   Q   Okay. But I'm trying to -- so that --
11   because I told you after the deposition we may have to
12   go to the court and say "Here's the questions he would
13   not answer" and let the judge decide "He has to answer
14   this" or "He doesn't have to answer that." Knowing
15   that we have to do that, I just want to make sure that
16   you know, if it's a question I ask and you don't know
17   the answer, tell me you don't know. Okay?
18   A   Okay.
19   Q   But if I ask you a question and you know the
20   answer, but you just don't want to tell me, then tell
21   me that. "I'm not going to answer that question."
22   Okay?
23   A   Okay.
24   Q   So in terms of did Dr. Vizcay serve as
25   medical director of Caleb, I believe your answer is

Page 75

1    that you don't know. Correct?
2    A   No.
3    Q   Are you familiar with medical coding and
4    billing?
5    A   No.
6    Q   Have you taken any classes on it?
7    A   No.
8    Q   Did anyone ever teach you to do it?
9    A   No.
10   Q   Who handled the medical coding and billing
11   for Caleb?
12   A   I imagine that that -- I don't know.
13   Q   But it wasn't you?
14   A   No, not me.
15   Q   Did you ever handle putting together or
16   typing up the reports from the doctor?
17   A   In other words, explain that again.
18   Q   Sure. When the doctor would see a patient
19   and would either write down notes or dictate notes, did
20   you ever type up the reports that said what the doctor
21   said about the patient, or did someone else handle
22   that?
23   A   No, not me.
24   Q   Were you ever responsible for billing the
25   insurance companies?

Page 76

1    A   No.
2    Q   Do you know whose decision it was as to how
3    much would be charged by the clinic for each thing that
4    was performed there?
5    A   No. I don't know.
6    Q   Did Caleb use a billing company, or was all
7    of the billing done inside the clinic?
8    A   I don't know really.
9    Q   Do you know what computer program Caleb used
10   for its medical records?
11   A   No. I don't know.
12   Q   Do you know how the doctor's medical records
13   are created -- who creates them and how they're done?
14   A   No. I don't know.
15   Q   Were you aware of someone named Vicki Kirby
16   coming to the clinic to do an inspection in July of
17   2009?
18   A   I don't know who that is.
19   Q   Do you recall being at Caleb when someone
20   showed up to come ask questions and look at the clinic?
21   A   Some inspectors would arrive there. But
22   really it was the secretary who would assist them
23   since -- I really had nothing to do with that.
24   Q   Do you recall the name Vicki Kirby or a lady
25   named Vicki Kirby coming in?

Page 77

1    A   I don't know. I remember someone who went
2    who asked the names of everyone who worked there.
3    Q   Were you ever sitting in the waiting area
4    with Lien Perez when someone came in to look at the
5    clinic?
6    A   I don't remember really.
7    Q   What is your understanding of what happened
8    when that person came into the clinic? You said you
9    recall she was asking the names of everybody that
10   worked there. What else happened?
11   A   I don't -- I don't remember what else.
12   Q   Do you remember what any of the people that
13   worked at Caleb -- what they said to her?
14   A   I don't know.
15   Q   Do you recall who spoke with that lady?
16   A   I don't know really.
17   Q   Did you ever talk to Dr. Vizcay about what
18   she said to that lady?
19   A   No.
20   Q   Did you ever talk to Bryan Toledo about what
21   he said to the lady that came in?
22   A   We're not going to talk about that, about
23   Bryan Toledo.
24   Q   Okay. So that's a question that you're not
25   going to answer?

20   (Pages 74 to 77)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 78

1    A   No.
2    Q   Did you ever talk to Lien Perez about what
3  she said to the lady that came in?
4    A   No.
5    Q   Who filled out the paperwork that was
6  submitted to the Agency for Health Care Administration
7  for Caleb?
8    A   I don't know who filled that out.
9    Q   Did you prepare any of the paperwork that was
10 submitted to the Agency for Health Care Administration?
11   A   No.
12   Q   Did you assist with any type of paperwork to
13 obtain either a license or an exemption for Caleb?
14   A   No.
15   Q   Are you aware of the law surrounding a clinic
16 like Caleb either getting a license or being exempt
17 from getting a license?
18   A   No.
19   Q   Do you know if Caleb was licensed with the
20 Agency for Health Care Administration or if it was
21 exempt?
22   A   I don't know really.  There were several
23 licenses there on the wall.  But since that -- like I
24 said, I was not -- that was not my job, so I don't
25 know.

Page 79

1    Q   Did Caleb have a massage establishment
2  license?
3    A   I don't know.  I imagine so.
4    Q   Did you fill out any of the paperwork for
5  Caleb to get a massage establishment license?
6    A   No.  I was not involved in that.
7    Q   Was Dr. Vizcay an independent contractor or
8  employee of Caleb?
9    A   How's that?
10   Q   Was Dr. Vizcay an independent contractor or
11 an employee of Caleb?
12   A   Well, that, you can ask the attorney as well.
13   Q   Is that a question that you're not going to
14 answer?
15   A   No.
16   Q   "No," meaning no, you're not going to answer?
17   A   No.  I'm not answering.
18   Q   Did Caleb issue Dr. Vizcay a W-2 or a 1099?
19   A   That, no, I'm not going to answer.
20   Q   Did Caleb issue Dr. Vizcay a K-1?
21   A   I can't answer.
22   Q   You're not going to answer, or you do not
23 know?
24   A   No.  No.  I'm not going to answer.
25   Q   Did Dr. Vizcay have a written employment

Page 80

1  agreement with Caleb?
2    A   I don't know.
3    Q   Do you know how much Dr. Vizcay was paid for
4  every patient she saw?
5    A   No.  I'm not going to talk about that.
6    Q   So you're not going to answer that question?
7    A   No.
8    Q   Do you know why Dr. Vizcay was an independent
9  contractor with Caleb if she was an owner of Caleb?
10   A   Well, you're the one saying that, and I don't
11 know anything about that.
12      MS. DENBO:  Out of tape?
13      THE VIDEO OPERATOR:  Yes.
14      MS. DENBO:  Okay.  We have to change the
15 tape.  Off the record.
16      THE VIDEO OPERATOR:  Going off the record
17 11:41 a.m.
18      (Deposition recessed 11:41 a.m. to 11:43
19 a.m.)
20      MS. DENBO:  Back on the record.
21      THE VIDEO OPERATOR:  We are back on the
22 record.  The time is 11:43 a.m.
23 BY MS. DENBO:
24   Q   Was Dr. Vizcay paid for every patient she saw
25 at Caleb?

Page 81

1    A   We're not going to talk about that either.
2    Q   So you're not going to answer that question?
3    A   No.
4    Q   Was Dr. Vizcay paid a fee to say that she was
5  the owner of Caleb?
6    A   We're not going to answer that.
7    Q   You're not going to answer that question?
8    A   No.
9    Q   Did Dr. Vizcay have to pay anything in order
10 to use the equipment or the facilities at the clinic?
11   A   I don't know.
12   Q   How were patients referred to Caleb, or how
13 did patients get to Caleb?  How did they know about the
14 clinic?
15   A   I don't know really.  They would call there
16 by phone.
17   Q   You said that you handled --
18   A   Yes.  Sometimes they'd call by phone, which
19 was -- or they would come in due to the sign.  They
20 would walk in.
21   Q   What type of advertising did you do for
22 Caleb?
23   A   Well, I would do business cards and would
24 hand them out at the stores.  Many -- many places where
25 there would be a lot of access to people.

21 (Pages 78 to 81)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 82

1    Q   I'm going to show you a copy of a business
2  card, front and back, for Caleb Health Care Center.
3         MS. DENBO:  I'm marking it as Exhibit C.
4         (Exhibit C was marked for identification.)
5  BY MS. DENBO:
6    Q   Does that look like the business card you're
7  talking about that Caleb had?
8    A   Exactly.
9    Q   Who designed that business card?
10   A   That, Dr. Vizcay.
11   Q   Do you know why the back of the business card
12 listed all of the types of treatments?
13   A   I don't know and — I don't know anything
14 about that.
15   Q   Did you play any role in deciding to put all
16 the treatments on the card?
17   A   No.
18   Q   Were there times when Dr. Vizcay was not
19 available to see patients and you would have to call
20 another chiropractor to come in and see the patients?
21   A   I didn't handle those operations.
22   Q   So there was never a time when you would call
23 chiropractors to come see patients?
24   A   No.
25   Q   Did you supervise Dr. Vizcay in any way?

Page 83

1    A   No.
2    Q   Was there ever a time when Dr. Vizcay had to
3  ask you permission to do something?
4    A   No.
5    Q   Who maintained Dr. Vizcay's calendar,
6  appointments?
7    A   That, she would, and the secretary.
8    Q   Did you ever close a bank account for Caleb?
9    A   How's that — how's that question?
10   Q   Did you ever tell a bank that you were
11 closing an account of Caleb's?
12   A   No.
13   Q   Who was listed --
14   A   No.
15   Q   Who was listed on Caleb's bank accounts?
16   A   That who was?  In other words, who was on
17 Caleb's bank account?  Is that what she's saying?
18   Q   Yes.
19   A   She and I.
20   Q   When you say "she," you're talking about
21 Dr. Vizcay?
22   A   Yes, Dr. Vizcay.
23   Q   Who is Madeley, M-a-d-e-l-e-y, Cortes,
24 C-o-r-t-e-s, Gallardo, G-a-l-l-a-r-d-o?
25   A   I don't know.

Page 84

1    Q   You don't know that person?
2    A   No.
3    Q   And I know you said you don't know Angel
4  Diaz.  Do you know an Angel Diaz Moreno, M-o-r-e-n-o?
5    A   No.
6    Q   Did Norge Romero or Deborah Perez ever serve
7  as a witness to any of the sales or purchases of homes
8  that you were involved in?
9    A   No.
10   Q   Was there a period of time where you
11 purchased three homes within eleven days?
12   A   I'm not going to answer, because that has
13 nothing to do with this.
14   Q   Was there ever a time when you sold three
15 homes on the same day to the same person?
16   A   That's nothing to do with this.  I'm not --
17   Q   During the time that you worked for Caleb did
18 you receive income from any other source besides Caleb?
19   A   No.
20   Q   While you were working at Caleb did you have
21 any concerns over how the business was run?
22   A   No.
23   Q   Is there any other information that pertains
24 to this case that you have knowledge about that we have
25 not discussed?

Page 85

1    A   No.
2    Q   If you were called as a witness in this case
3  is there anything else that you would testify to other
4  than what we have already talked about?
5    A   No.
6    Q   In the subpoena that you were served with
7  that you have in front of you, it requests that you
8  bring a number of documents with you to the deposition.
9  Did you bring any documents with you today?
10   A   No.  I didn't bring any, because those
11 documents are not mine.  You're asking for things from
12 the corporation.
13   Q   And we'll go through the document request
14 which is in Exhibit A to the deposition notice that's
15 being attached as Exhibit A.  Okay.  Numbers 1 through
16 5 -- do you want to turn to that page?  Numbers 1
17 through 5 pertain to documents of Caleb.  Are you in
18 possession of any of those documents?
19   A   No.
20   Q   Do you have access to any of those documents?
21   A   No.
22   Q   Number 6 is copies of individual tax returns
23 for yourself for the years 2007 through present.  Did
24 you bring any of those?
25   A   No.

22  (Pages 82 to 85)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)                    5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 86

1   Q   Why didn't you bring those?
2   A   Because that's personal, and I don't think
3   that has to come and be reflected in any of this.
4   Q   So you're refusing to give those at this
5   time?
6   A   Yes.
7   Q   The Number 7 is copies of any corporate tax
8   returns for Caleb. Are you in possession or do you
9   have access to any of Caleb's tax returns?
10  A   No.
11  Q   And if you'd just keep glancing down with me.
12  Starting from Number 8 going down to 13, those are
13  primarily copies of documents pertaining to Caleb. And
14  is it your position again that you don't have access to
15  those documents, and they're not in your possession?
16  A   Correct.
17  Q   Okay. Number 14 is a copy of documents that
18  would be contained within your file from Caleb such as
19  W-2s, W-9s, 1099s, contracts, things of that nature as
20  specifically stated here in Paragraph 14. Are you
21  providing any of those records for us today?
22  A   No.
23  Q   Why are you not providing them?
24  A   Because like I said, it's the same thing.
25  Those are personal things of mine which I do not want

Page 87

1   to give.
2   Q   So you're refusing to provide those at this
3   time?
4   A   Exactly.
5   Q   Number 15. Copies of any records regarding
6   any money taken out of Caleb by you. Did you bring any
7   of those records?
8   A   No.
9   Q   Why not?
10  A   Because that is from the corporation which
11  belongs to Dr. Vizcay.
12  Q   And do you have any personal records of
13  what's requested in 15?
14  A   How's that question?
15  Q   For what we have asked for here in Number 15,
16  do you have any records, any personal records that
17  would have this kind of information, or are they all
18  just the records of Caleb?
19  A   She has that. I don't have any of that.
20  Q   And if you keep reading down, Numbers 16
21  through 22, those are all pertaining to records of
22  Caleb. Do you personally have any of those records in
23  your possession, or do you have access to them?
24  A   No.
25  Q   Going to 23. Copies of any and all check

Page 88

1   registers for all bank accounts held by you or by Caleb
2   reflecting transactions or payments between you and
3   Caleb for the years 2007 through present. Did you
4   bring any of your personal bank records with this
5   information?
6   A   No.
7   Q   Why not?
8   A   Because that's personal.
9   Q   So you're refusing to provide that at this
10  time?
11  A   Yes.
12  Q   And then Numbers 24 and 25 are similar and
13  that they're asking for personal banking records of
14  yours. Is that the same answer as Number 23 for you?
15  You're refusing, because they're personal?
16  A   Yes.
17  Q   So there's no documents that you brought here
18  today for us. Correct?
19  A   No.
20      MS. DENBO: Okay. Guys, can you just give me
21  about five minutes to review and wrap up, and then
22  we'll come back on the record?
23      MS. SIMOES: Okay. That's fine.
24      MS. DENBO: Thank you.
25      THE VIDEO OPERATOR: Going off the record at

Page 89

1   11:56 a.m.
2       (Deposition recessed 11:56 a.m. to 12:09
3   p.m.)
4       THE VIDEO OPERATOR: Back on the record at
5   12:09 p.m.
6   BY MS. DENBO:
7   Q   Earlier in the deposition we had talked about
8   whether or not you had been a party to a lawsuit,
9   meaning you brought a case against someone in court or
10  if someone brought a case against you. Did you have a
11  judgment entered against you in Hillsborough County in
12  2010 by Portfolio Recovery?
13  A   How's that?
14  Q   Portfolio Recovery. It looks like possibly
15  for a debt that you didn't pay. Sometimes that could
16  be a credit card, a hospital bill. It could be any
17  type of debt. Do you know if you had a court judgment
18  entered against you?
19  A   I don't know.
20  Q   How about one in 2008 in Dade County for
21  Beneficial Florida?
22  A   What is that -- how does that concern the
23  Allstate Company if it were true?
24  Q   Well, we don't get into long conversations
25  during a deposition about how something pertains or

23 (Pages 86 to 89)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 90

1   not. If you feel that it's personal and you're not
2   going to answer it --
3       A   That's personal. I'm not going to answer it.
4       Q   Okay. So you're refusing to answer the
5   question with regard to the 2008 judgment in Dade
6   County?
7       A   Yes, I refuse.
8       Q   Did you used to live in Hialeah?
9       A   Yes.
10      Q   And did you own property in the Miami area?
11      A   Yes.
12      Q   Who lives with you at this time?
13      A   How's that?
14      Q   Who lives with you?
15      A   Well, my female partner and my children.
16      Q   What's your female partner's name?
17      A   I don't have a reason to say that name.
18      Q   So you're refusing to answer that question?
19      A   Yes.
20      Q   What are the names of your children that live
21  with you?
22      A   Neither that. That doesn't matter.
23      Q   So you're refusing to answer that question?
24      A   Yes.
25      Q   During the time that you purchased three

Page 91

1   homes in 2007 were you working anywhere else besides
2   driving trucks?
3       A   We're not going to talk about that.
4       Q   Are you refusing to answer that question?
5       A   Yes.
6       Q   How much were you paid by Caleb for the years
7   2007 through 2011?
8       A   We're not going to talk about that either.
9       Q   Are you refusing to answer that question?
10      A   Yes.
11      Q   During those years where you were working for
12  Caleb did you receive income from any other source
13  besides Caleb?
14      A   We're not going to talk about that either.
15      Q   Refusing to answer the question?
16      A   Yes.
17      Q   Who is Hugo Vargas, V-a-r-g-a-s?
18      A   I don't know.
19      Q   Do you know Carlos Torres?
20      A   No.
21      Q   Did you play any role in deciding that Caleb
22  would no longer see patients?
23      A   No.
24      Q   What happened to Caleb's bank accounts?
25      A   I don't know. You can ask Dr. Vizcay.

Page 92

1       Q   And I know you had previously indicated that
2   you were not going to answer a question pertaining to
3   how you knew Dr. Vizcay prior to Caleb. I'm going to
4   ask a little different of a question. Prior to you
5   working at Caleb did you have any other business
6   contact or relationship with Dr. Vizcay?
7       A   No.
8       Q   Was Dr. Vizcay a personal friend?
9       A   Not really.
10      Q   Was there a person that introduced you to
11  Dr. Vizcay?
12      A   The question just up to that point regarding
13  that.
14      Q   Are you refusing to answer the question? Is
15  that what you're saying?
16      A   Yes.
17      Q   Do you still talk to Dr. Vizcay?
18      A   No.
19      Q   When is the last time you talked to her?
20      A   A while ago. I don't remember.
21      Q   Was the only money that you ever received
22  from Caleb money for your salary?
23      A   Could you explain that again?
24      Q   Sure. I know you said that you received
25  money from Caleb to pay your salary. Did you ever

Page 93

1   receive any other compensation from Caleb besides for
2   your salary?
3       A   No.
4       Q   Did you ever receive any gifts from Caleb?
5       A   No.
6       Q   Were you ever given any homes as a result of
7   you working at Caleb?
8       A   How's that?
9       Q   Did anyone ever give you property or a house
10  in exchange for the work you were doing at Caleb?
11      A   No.
12      Q   Did you ever pay anyone with a house or
13  property in exchange for work they did at Caleb?
14      A   No.
15      Q   Are you aware of any paperwork being done
16  with the State of Florida for Caleb as a result of a
17  change in the law as to who could own Caleb?
18      A   No. I don't know anything about that.
19      Q   I believe you answered this, but I want to be
20  sure. Did you ever withdraw any cash from a bank
21  account of Caleb's?
22      A   Those things are from Dr. Vizcay's business.
23  I don't have to answer that.
24      Q   So you're refusing to answer that question?
25      A   Yes.

24   (Pages 90 to 93)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 94

1    Q   So the first question was, did you withdraw
2  any cash from a bank account of Caleb's?  The next
3  question is, did you ever keep any cash that was
4  withdrawn from a bank account for Caleb?
5    A   No.
6    Q   The answer is no, or no, you're not answering
7  it?
8    A   No.  No, that I don't have, that I never took
9  any money from there, nor did I keep any money.
10   Q   Do you have a personal bank account at any of
11 the same banks where Caleb has a bank account?
12   A   That's not something that -- no.  I'm not
13 going to answer.
14   Q   So you're not answering that question?
15   A   No.
16   Q   Did you ever take any money out of your
17 personal bank account to pay for anything related to
18 Caleb?
19   A   No.
20   Q   No, you're not answering, or the answer is
21 no?
22   A   No.  No.  No.  I didn't give any money to pay
23 anything.
24   Q   You said that you went to an accountant for
25 Caleb.  What was the name of the accountant that you

Page 95

1  used?
2    A   The accountant -- let me see if I remember
3  the name of the corporation.  I don't remember the name
4  of that.
5    Q   Did you ever use someone with the last name
6  Trancoso, T-r-a-n-c-o-s-c-o?
7    A   I think that is the accountant of the doctor
8  for other things that she uses.  I don't know.
9    Q   Did you ever personally use the same
10 accountant that you were using for Caleb?
11   A   I think that one or two times she -- he came
12 looking for some papers or something, but -- following
13 her instructions and --
14   Q   So there were times when you personally used
15 the same accountant that you used for Caleb?
16   A   No.  I didn't really use him.  I just
17 provided him with papers that he needed from the
18 corporation.
19   Q   Okay.  But not talking about papers for the
20 corporation.  Meaning like your own personal taxes.
21   A   Oh, mine.
22   Q   Yes.
23   A   No.
24   Q   Did you ever use the same accountant for your
25 own personal taxes that you used for Caleb?

Page 96

1    A   No.
2    Q   Did you ever provide one of the clinic's
3  business cards to a patient to assist them with
4  testimony that they had to provide regarding what
5  services they received from Caleb?
6    A   No.
7    Q   Did you ever know anyone that lived at 6410
8  Axelrod as their home address?
9    A   No.
10       MS. DENBO:  Kim, I just want to clarify with
11 you -- I know from his perspective we're good.  I
12 just want to make sure you're okay with it.  I
13 have a series of questions related to Bryan
14 Toledo.  He has said that I don't need to read all
15 those questions, that he's not going to answer any
16 of them.  Are you okay with me not waiving the
17 questions by not specifically going through each
18 of them?
19       MS. SIMOES:  Yeah.  That's fine.
20       MS. DENBO:  Thank you.
21       (Exhibit D was marked for identification.)
22 BY MS. DENBO:
23   Q   I'm going to show you an exhibit that I'm
24 marking as Exhibit D.  This is some property records
25 that are public records.  The first one on Page 1, if

Page 97

1  you look in the upper left-hand corner, it says it was
2  prepared by Eusebio Aquino.  And then it was to be
3  returned to Ramon D. Moreno.  Who is Ramon Moreno?
4    A   Well, this is of no interest to the Allstate
5  Company, because this is not related to Caleb Health
6  Care, nor has it -- nor does it have anything to do
7  with that.  So I don't want to talk about that.
8    Q   Okay.  So refusing to answer that question?
9    A   Yes.
10   Q   Okay.  And like we said before, the court
11 requires me to still ask my questions.  Hold on one
12 second.
13   A   If the judge --
14   Q   I have to still ask them.  You can refuse to
15 answer them, and we'll deal with that with the judge
16 later.  But just know that I have to -- I have to
17 finish asking the questions.  Okay?
18   A   Okay.
19   Q   On that same document on Page 1 the witness
20 is Norge Romero, and there's also a witness of Deborah
21 Perez.  Can you explain why they are witnesses on a
22 property transaction you were involved in?
23   A   I'm not going to talk about this.
24   Q   If you flip over to the second page,
25 Page 2 --

25  (Pages 94 to 97)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 98

1    A   Don't even waste your time. We're not going
2    to talk about this.
3    Q   I wish I could just say that. Unfortunately,
4    that's not the way it works. The judge requires me to
5    ask my questions. Okay? But like I said, if you're
6    going to refuse to answer --
7    A   Ask them.
8    Q   -- we'll deal with that later with the judge.
9    And on Page 2 it's another property transaction for the
10   sum of $10 where the property went from Martha Diaz
11   Moreno to Jeffrey David Abrahamson. Are you going to
12   refuse to answer any questions regarding that property
13   transaction?
14   A   Yes.
15   Q   Flipping over to Page 3, there's a December
16   6, 2007 property transaction from Ramon Diaz Moreno to
17   Martha Diaz Moreno regarding some of the same property
18   we're talking about. Are you going to refuse to answer
19   any questions pertaining to this document or that
20   transaction?
21   A   Yes.
22   Q   And that document was notarized by Danai,
23   D-a-n-a-i, Diaz. And you had previously said you
24   didn't know who that was. Do you recall who she is
25   now?

Page 99

1    A   No.
2    Q   That same Page 3 also has a witness --
3    A   Can I ask a question?
4    Q   Sure.
5    A   When you buy a house, do you really have to
6    know the seller? Does it have to be your friend, or
7    when you sell a property do you have to be their
8    friend?
9    Q   Well, several of these people that are listed
10   in these documents also have something to do with auto
11   accident clinics. So that's why it's relevant to me to
12   ask you these questions. But like I said, if you're
13   going to refuse to answer them, we don't deal with that
14   today. You just refuse to answer it today, and then we
15   talk to the judge later, and we deal with it later.
16   But I just want you to know I have to ask the
17   questions. The judge makes me finish my questions.
18   Okay? That's the way the process works.
19   A   Okay.
20   Q   And then like I said, we go to the judge
21   later to figure out if you have to answer it or not.
22   Okay?
23   A   Nor the judge, nor anyone. If I don't want
24   to answer it, I won't answer it.
25   Q   Okay. On this Page 3 it also has a witness

Page 100

1    of Dailin Rojas whom you said that you did not know.
2    Are you going to tell me how you know her or if you
3    know her?
4    A   I don't know her.
5    Q   Okay. Turning over to Page 4 --
6    (Court reporter asked for clarification of
7    the answer.)
8    BY MS. DENBO:
9    Q   Turning over to Page 4, there is another
10   warranty deed prepared -- it says it's prepared by
11   Eusebio M. Aquino, and this is for August 2nd of 2007.
12   It's another $10 transaction. And the witness is Norge
13   Romero and Deborah Perez. Are you willing to talk
14   about this transaction?
15   A   No.
16   Q   On Page 5 there is a warranty deed from
17   December 13th of 2010 by Jeanette, J-e-a-n-e-t-t-e,
18   Angulo, A-n-g-u-l-o, to Martin and Darlene Pitts. Are
19   you willing to talk about this transaction?
20   A   No.
21   Q   And that transaction is on Pages 5 and 6. On
22   Page 7 there's a warranty deed from May 3rd, 2010 from
23   Daysi, D-a-y-s-i, Rojas Perez to Jeanette Angulo,
24   another $10 transaction. Are you willing to talk about
25   this transaction?

Page 101

1    A   No. I don't know. I'm not involved in it.
2    From there back I'm not involved with it. I can't
3    answer. I can't say.
4    Q   Well, that's why it's important that we talk
5    about it, because I wouldn't know unless you told me.
6    So Pages 7 to 8 are the same transaction, and you said
7    you're not involved in those. Flipping over to Page 9,
8    it's a warranty deed from December 6, 2007 by Ramon
9    Diaz Moreno to Daysi Rojas Perez. And is this also one
10   that you said you're not involved in?
11   A   No.
12   Q   Page 10. It says up top "Prepared by Eusebio
13   M. Aquino." It's an August 2nd, 2007 transaction
14   between Eusebio Manuel Aquino and Ramon Diaz Moreno.
15   The witnesses are Norge Romero and Deborah Perez. Are
16   you willing to talk about this transaction?
17   A   No.
18   Q   So refusing to answer that -- any questions
19   pertaining to that transaction?
20   A   Yes.
21   Q   Page 11. There's a Certificate of Title.
22   The date of the transaction is May 8th, 2007. And it
23   shows something being sold to Eusebio Manuel Aquino.
24   Are you willing to talk about this transaction?
25   A   No.

26  (Pages 98 to 101)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)                                  5a2c4cc5-2260-4a64-90f2-e25d164c344f

Page 102

```
1       Q   So refusing to answer any questions
2   pertaining to that transaction?
3       A   Yes.
4       Q   And on Page 12 -- I know it's a bad copy.
5   But there's another property transaction with a clerk
6   stamp of May the 8th.  We'll skip over that so we can
7   obtain a better copy.  Page 13 is a Certificate of
8   Title where the property as described on the next page
9   of Exhibit A was sold to Eusebio Manuel Aquino.  Are
10  you willing to discuss that transaction or anything
11  related to it?
12      A   No.
13      Q   So you're refusing to --
14      A   No.
15      Q   So you're refusing to answer any questions
16  pertaining to that transaction?
17      A   Yes.
18          MS. DENBO:  I don't have any other questions
19      for you today.  As I explained, part of the
20      process is we continue the deposition so that we
21      can decide if we need to go to the judge and ask
22      the judge if you have to answer any of those
23      questions that you refused to answer.  Okay?  So
24      we're continuing your deposition.  It may be that
25      in the future there's additional questions you
```

Page 103

```
1   have to answer, but we'll deal with that later.
2          I just want to make sure.  Kim, Inga, did you
3      guys have anything you wanted to ask?
4          MS. SIMOES:  No.  I'm not going to have any
5      questions for the witness.
6          MS. CALLAHAN:  No, me neither.
7          MS. DENBO:  Thank you.  Okay.  Do you
8      understand that we're not -- we're done for today,
9      but we may not be done.  We'll have to wait and
10     see what a judge says.  Okay?
11         THE WITNESS:  That's fine.
12         MS. DENBO:  Have you been able to understand
13     everything the interpreter has been saying today?
14         THE WITNESS:  Yes.
15         MS. DENBO:  Do you have any questions?
16         THE WITNESS:  No.
17         MS. DENBO:  Thank you very much for coming
18     today.  This concludes your deposition, at least
19     for today.  But it is continued.  Off the record.
20         THE WITNESS:  That's fine.
21         THE VIDEO OPERATOR:  This concludes the
22     deposition.  The time is approximately 12:34.
23         THE COURT REPORTER:  Do you want me to hold
24     this one?
25         MS. DENBO:  No, order it.
```

Page 104

```
1          (At 12:34 p.m., no further questions
2      were propounded to this witness.)
```

Page 105

```
1              CERTIFICATE OF REPORTER
2   STATE OF FLORIDA
3   COUNTY OF HILLSBOROUGH
4       I, Terri Dukes, Registered Professional
5   Reporter, do hereby certify that I was authorized
6   to and did stenographically report the foregoing
7   deposition of EUSEBIO MANUEL AQUINO; that a review
8   of the transcript was not requested; and that the
9   foregoing transcript, Pages 1 through 104, is a true
10  record of my stenographic notes.
11      I further certify that I am not a relative,
12  employee, attorney, or counsel of any of the
13  parties, nor am I a relative or employee of any
14  of the parties' attorneys or counsel connected
15  with the action, nor am I financially interested
16  in the action.
17      DATED this 1st day of October, 2012.
18
19
20
21
22
23      _Terri Dukes_
        Terri Dukes, RPR
24
25
```

27  (Pages 102 to 105)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f

Eusebio Manuel Aquino - 9/24/2012

Page 106

```
 1              CERTIFICATE OF OATH
 2   STATE OF FLORIDA
 3   COUNTY OF HILLSBOROUGH
 4       I, Terri Dukes, Registered Professional
 5   Reporter, Notary Public, State of Florida, certify
 6   that the witness, EUSEBIO MANUEL AQUINO, personally
 7   appeared before me on the 24th day of September, 2012
 8   and was duly sworn.
 9       WITNESS my hand and official seal this 1st
10   day of October, 2012.
11   Identification:
12          Personally Known
13     Or Produced Identification  X
14   Type of Identification Produced  Fl Driver's License
15
16
17
18
19
20   Terri Dukes
     _____
     Terri Dukes, RPR
21   Notary Public - State of Florida
     Commission No.: EE062381
22
     My Commission Expires:  April 13, 2015
23
24
25
```

28  (Page 106)

Electronically signed by Terri Dukes (501-405-088-2028)
Electronically signed by Terri Dukes (501-405-088-2028)

5a2c4cc5-2260-4a64-90f2-e25d164c344f